# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01144-COA

**IN THE MATTER OF THE DISSOLUTION OF
THE MARRIAGE:**

**VANESSA MARIE PEVEY (BLACK)**                                        **APPELLANT**

**v.**

**DALLAS KENT PEVEY JR.**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/25/2017 |
| TRIAL JUDGE: | HON. JOHN S. GRANT III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEPHEN L. BEACH III |
| ATTORNEY FOR APPELLEE: | PAUL E. ROGERS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED: 08/28/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., FAIR AND TINDELL, JJ.**

**FAIR, J., FOR THE COURT:**

¶1.     A little more than a year after their divorce, Dallas Pevey sued his ex-wife, Marie Black, to modify the custody of their two children. The chancellor initially denied relief, but he expressed reservations with the decision. When Dallas filed a motion to reconsider, the chancery court gave him a hearing and heard additional testimony. Ultimately, the chancery court found that Marie had testified falsely at the initial hearing, and custody of the children was awarded to Dallas. Marie appeals and asserts numerous errors, both procedural and substantive. We find that the chancery court acted within its discretion, and so we affirm.

## FACTS

¶2.    Dallas and Marie divorced in 2014. Physical custody of their two young sons, born in 2008 and 2011, was awarded to Marie by agreement. In 2015, Dallas filed a petition to modify custody. Dallas alleged, among other things, that Marie was using illegal drugs, acting erratically, moving around frequently, and was not adequately caring for the children. After a hearing, the chancery court called it a "close case" and expressed concerns about the children's circumstances, but it found Dallas had failed to show a material change of circumstances adversely affecting the children. Dallas then filed what he styled a "Motion to Reconsider or, in the Alternative, to Amend Judgment pursuant to Rules 59 and 60" of the Mississippi Rules of Civil Procedure. Dallas contended he had newly discovered evidence and Marie had made numerous false statements at the hearing relating to her employment, living situation, and drug use. The chancery court held a hearing on the motion where it heard additional testimony and then rendered a new decision, awarding custody to Dallas.

**DISCUSSION**

### 1.    Motion to Reconsider

¶3.    Marie contends that the chancery court erred in granting Dallas's "motion to reconsider" because the claimed newly discovered evidence was lacking and could have been presented at the original hearing. Marie argues, essentially, that the chancery court gave Dallas a "do over" rather than holding him to the stricter standard that Rule 59 requires. But she is wrong about that legal standard.

¶4.    It is true that, under the "new" Rules of Civil Procedure, the motion for

2

reconsideration technically no longer exists. *See Maness v. K & A Enters. of Miss. LLC*, No. 2017-CA-00173, 2018 WL 3791250, at \*12 (¶68) (Miss. Aug. 9, 2018) (Maxwell, J., specially concurring and joined by four other justices). But the motion at issue here was properly made, and considered, under Rule 59. *See id.*

¶5.     The chancery court's authority to modify the final judgment is "limited" by Rule 59, and it is a "higher" standard than under Rule 54(b), which allows a trial court to set aside interlocutory decisions for any reason it sees just. *Id.* at \*13 (¶¶69, 71). Still, Rule 59 permits a chancery court substantial discretion to reconsider its decisions—either on the motion of a party, or sua sponte "for any reason for which it might have granted a new trial on motion of a party." *See* M.R.C.P. 59(d). When a case has been tried to the court, Rule 59(a) expressly provides that a new trial may be granted "for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of Mississippi." "The ground rules [for a Rule 59 motion in chancery court] include those that preexisted the Civil Rules regarding the grant or denial of trial court rehearings." *Mayoza v. Mayoza*, 526 So. 2d 547, 549-50 (Miss. 1988). In *In re Enlargement of Corporate Limits of Hattiesburg*, 588 So. 2d 814, 828 (Miss.1991), the supreme court explained that "[i]n equity, the chancellor has always had entire control of his orders and decrees and authority to modify or vacate any of them on motion of any party, or on his own, prior to final judgment." While the chancellor's order may have been styled a final judgment, it was rendered non-final by Dallas's filing of the motion to reconsider. *See Wilson v. Mallett*, 28 So. 3d 669, 670 (¶3)

3

(Miss. Ct. App. 2009). "It is long-settled that when a final judgment is reopened [under Rule 59,] the judgment remains subject to the control of the court until the motion is disposed of and, until that time, does not become final." *E.E.O.C. v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U.S. & Canada, Local No. 120*, 235 F.3d 244, 250 (6th Cir. 2000).

¶6.     To grant the motion under Rule 59, the chancery court need only be "convinced that a mistake of law or fact has been made, or that injustice would attend allowing the judgment to stand." *See Maness*, 2018 WL 379125, at *13 (¶69) (Maxwell, J., specially concurring) (quoting *McNeese v. McNeese*, 119 So. 3d 264, 272 (¶20) (Miss. 2013)). This is an independent basis for granting the motion, distinct from the court's authority to order a new trial on the presentation of newly discovered evidence. *Id.* "When hearing a motion under Rule 59(e), a trial court proceeds *de novo*, if not *ab initio*. Recognizing that to err is human, Rule 59(e) provides the trial court the proverbial chance to correct its own error to the end that we may pretermit the occasion for a less than divine appellate reaction." *Bruce v. Bruce*, 587 So. 2d 898, 904 (Miss. 1991). A Rule 59 motion is the "functional equivalent" of a motion for rehearing on appeal. *King v. King*, 556 So. 2d 716, 722 (Miss. 1990).

¶7.     Although Rule 59(a) refers to a "new trial," when a case was tried to the court, the formality of a full retrial is not required. Under Rule 59(a), the chancellor "may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new

judgment." *Id.*

¶8.     Motions under Rule 59 should be distinguished from motions under Rule 60(b), which seek "extraordinary relief" from a judgment that is truly final.  Rule 60(b) motions are for "extraordinary and compelling circumstances" and "should be denied when they are merely an attempt to relitigate the case." *S. Healthcare Servs. Inc. v. Lloyd's of London*, 110 So. 3d 735, 742 (¶14) (Miss. 2013).  "[T]he trial court has considerably broader discretionary authority under Rule 59(e) to grant relief than it does under Rule 60(b)." *King*, 556 So. 2d at 722.

¶9.     In *Adams v. Green*, 474 So. 2d 577, 582 (Miss. 1985), the supreme court quoted its 1854 decision in *Dorr v. Watson*, 28 Miss. 383 (1854), which has been "consistently applied in case after case" ever since:

> The granting of a new trial rests in a great measure upon the sound discretion of the court below, to be exercised under all the circumstances of the case with reference to several legal rules as well as the justice of a particular case. If a new trial be refused, a strong case must be shown to authorize the appellate court to say that it was error; and so, if it be granted, it must be manifest that it was improperly granted.

"[G]iven the important corrective role of new-trial motions, the discretion granted to the court is exceedingly broad." *Barriffe v. Estate of Nelson*, 153 So. 3d 613, 618 (¶22) (Miss. 2014).

¶10.    Sitting as an appellate court, we are in no position to second guess the chancellor on whether he made an error in his initial credibility determinations.  We therefore can find no abuse of discretion in granting the Rule 59 motion.

## 2.     Guardian Ad Litem Recommendation

¶11.    Next, Marie contends that the chancellor erred in not considering the recommendation of the guardian ad litem. In fact, there was no recommendation to consider; the guardian ad litem in this case was appointed for the limited purpose of investigating Dallas's allegations of abuse and neglect. The guardian ad litem concluded that the children had been neither abused nor neglected while in Marie's care. But he specifically declined to make recommendations as to whether a material change in circumstances had occurred or who should receive custody if that became an issue, though he did answer some questions that touched on those issues. Marie's attorney asked the guardian ad litem whether he knew of "anything that is currently happening" that would justify a modification of custody. The guardian ad litem answered "no," but he made it clear he was limiting his answer to the current circumstances. The chancellor also asked the guardian ad litem whether there were any "per se" adverse impacts to the children. The answer to this question was a qualified yes. The guardian ad litem was concerned that one of the children had been tardy to school twenty-six times during a single semester, though he conceded that others may not weigh it as heavily as he did. When the chancellor announced his initial decision in this matter, he briefly addressed the tardiness issue, but he did not fully summarize the guardian ad litem's testimony or address it as a custody recommendation. In announcing the judgment on reconsideration, the chancellor only briefly referenced the guardian ad litem's testimony, to the effect that, even if it was accepted, it did not foreclose the possibility of modifying

6

custody.

¶12.     The Mississippi Supreme Court has held that the chancellor is required to include a summary of the guardian ad litem's recommendations when the appointment is mandatory, as it is in cases where abuse or neglect has been alleged. *Borden v. Borden*, 167 So. 3d 238, 243 (¶11) (Miss. 2014). But the supreme court has also made it clear that a chancellor has discretion in determining the scope of the guardian ad litem's assignment, and the assignment need not include making a recommendation as to custody. In *S.G. v. D.C.*, 13 So. 3d 269, 282 (¶57) (Miss. 2009), the supreme court explained: "[A] guardian ad litem appointed to investigate and report to the court is obligated to investigate the allegations before the court, process the information found, report all material information to the court, and (if requested) make a recommendation." *See also Smith v. Smith*, 206 So. 3d 502, 510 (¶13) (Miss. 2016) (guardian ad litem "must make recommendations to the court if requested"). Where the guardian ad litem has not made direct recommendations concerning custody, there is no error in the chancellor's failure to discuss them. *See id.* at 511 (¶19).

¶13.     The guardian ad litem here was assigned to investigate whether the children were abused or neglected in Marie's care; he found that they were not. The chancellor accepted that conclusion, and Marie does not contest it. We can find no error in the chancellor's failure to discuss the guardian ad litem's report at length.

### 3.     Admission of Annotated E-mail

¶14.     Marie contends that the chancellor erred in refusing to admit into evidence a copy of

7

an e-mail with handwritten notes from Marie's mother. She concedes that the notes are hearsay, but she contends they were admissible under Mississippi Rule of Evidence 801(d)(1)(A) and (B), which allow the admission of prior statements as non-hearsay under certain circumstances.

¶15. It is apparent that the printout and annotations meet neither exclusion to the hearsay rule. Rule 801(d)(1)(A) requires (among other things) that the prior statement "be given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." The handwritten annotations to the e-mail were not. 801(d)(1)(B) requires that the statement be "consistent with the declarant's testimony" and offered to rebut a contention of recent fabrication; Marie offered the annotated e-mail to *support* her claim that her mother's testimony was a recent fabrication.

¶16. Marie has shown no error in the chancellor's refusal to admit the annotated e-mail into evidence.

### 4. Modification

¶17. Marie next challenges the chancellor's decision to modify custody. In this issue she does not directly contend that the evidence could not support the decision; rather, she attacks various aspects of the chancellor's decision, some based on fact and some based on law.

¶18. Our review of domestic-relations matters is limited. *Chesney v. Chesney*, 849 So. 2d 860, 862 (¶8) (Miss. 2002) (citing *Montgomery v. Montgomery*, 759 So. 2d 1238, 1240 (¶5) (Miss. 2000)). The chancellor's findings of fact will not be disturbed on appeal if they are

8

supported by substantial credible evidence. *Carter v. Carter*, 204 So. 3d 747, 756 (¶37) (Miss. 2016) (citing *Marascalco v. Marascalco*, 445 So. 2d 1380, 1382 (Miss. 1984)). We will not reverse the decision of a chancery court unless the chancellor abused his discretion, was manifestly in error, or applied an erroneous legal standard. *Dupree v. Pafford*, 200 So. 3d 1092, 1094 (¶4) (Miss. Ct. App. 2016) (citing *Pearson v. Pearson*, 121 So. 3d 266, 268 (¶6) (Miss. Ct. App. 2013)).

¶19. Marie's first contention is that the chancellor erred in relying on *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996), and *Tucker v. Tucker*, 453 So. 2d 1294 (Miss. 1984), because those two decisions "are not the complete authority and total reliance and focus on just these two . . . cases is misplaced." While these were the only two decisions concerning the custody modification standard the chancellor mentioned by name when he announced his decision from the bench, they are notable and often-cited decisions of the Mississippi Supreme Court on the subject, and both are good law in the present day. The chancellor cited *Tucker* for the general standard regarding modification of custody—a material change of circumstances and an adverse effect on the child—and *Riley* for a specific exception to the general test permitting modification "where a child living in a custodial environment clearly adverse to the child's best interest, somehow appears to remain unscarred by his or her surroundings." *Riley*, 677 So. 2d at 744. The chancellor found that this case met the standard for modification under either test.

¶20. The chancellor gave no indication that he misunderstood the legal standard or that he

9

gave the cases he mentioned by name any undue weight as to their particular facts or holdings. Rather, he cited them for the principles of law they discussed. Marie seems to complain the chancellor failed to recognize that custody modification requires an examination of the totality of the circumstances, which she claims was a later development in the law; but, in fact, that was part of *Tucker*'s holding and a proposition for which it is often cited. *See Tucker*, 453 So. 2d at 1297; *see also A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1013 (¶24) (Miss. 2012) (citing *Tucker*). We see no error in the chancellor's citation to these cases.

¶21. Marie next argues the chancellor erred in finding the testimony of her mother credible because she had previously executed an affidavit supportive of Marie's home conditions and parenting ability; her mother subsequently described herself as the children's primary caregiver (when she and Marie were getting along) and Marie as unstable and manipulative. Marie also faults the chancellor for accepting the testimony of Justin Atwood to the effect that they had been in a sexual relationship and had spent the night together in the children's presence; Marie denied this allegation, but one of her children confirmed to the chancellor *in camera* that he knew Atwood and Marie "had a relationship" because he had walked in on them in what the chancellor called a "compromising position." On appeal, Marie takes issue with this description, arguing that the chancellor made an unsupported inference from the testimony.

¶22. Specifically, the child testified that Marie and Atwood were "about to kiss" while

Atwood "had his underwear on and all of that." When the child opened the door, Atwood "did it real fast and hid something from me or something like that."

¶23. It is axiomatic that "the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Bowen v. Bowen*, 982 So. 2d 386, 395 (¶42) (Miss. 2008). We find that the chancellor's interpretation of the child's testimony, especially when paired with Atwood's testimony confirming a sexual relationship with Marie, was a reasonable interpretation of the evidence.

¶24. As to the prior affidavits executed by Atwood and Marie's mother, inconsistent statements of a witness go to the weight of that witness's testimony, not its sufficiency. *Jamison v. Barnes*, 8 So. 3d 238, 245 (¶17) (Miss. Ct. App. 2008). Both witnesses explained why they had executed the affidavits and subsequently recanted them, and their testimony at trial was corroborated in many respects. We cannot second guess the chancellor's determination of credibility here.

¶25. Finally, Marie contends that the chancellor erred in assigning undue weight to moral fitness in his *Albright*[1] factor analysis to decide who should receive custody. *See, e.g.*, *Brekeen v. Brekeen*, 880 So. 2d 280, 286-87 (¶19) (Miss. 2004). Here, the chancellor did discuss Marie's relationships at length, and he did find that they negatively impacted her moral fitness; but moral fitness was not the reason the chancellor spent so much time

---

[1] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

discussing them. In the case of Atwood, the chancellor found the relationship relevant because the children had been exposed to it. But the chancellor was especially interested in it because Marie had repeatedly lied about her relationship with Atwood while under oath, and the credibility of her denials of other misconduct was of paramount importance to the ultimate disposition of the trial.

¶26. The chancellor also discussed another of Marie's relationships, but in that case the man was a drug addict who saw Marie between his visits to rehab. He testified that he and Marie had used crystal methamphetamine while Marie's mother watched the children. The chancellor found the man's testimony credible, and he placed significant emphasis on Marie's association with the man and use of illegal drugs as both a material change of circumstances and an indictment of her fitness as a custodial parent.

¶27. We note also that the chancellor did not linger on these relationships when discussing the moral fitness *Albright* factor. The entirety of his moral fitness discussion follows:

> Moral fitness is not even [a] close contest. [Marie] has exposed the children to immorality with her relationships with other men. She has consorted with a drug addict. She has in all probability been using illicit substances.

¶28. The credibility of Marie's denials of misconduct, instability, and poor parenting was one of the central issues in the trial, and her abuse of drugs was highly relevant to her fitness as a custodial parent. We cannot find that the chancellor placed an undue emphasis on moral fitness or that the chancellor awarded custody to Dallas to punish Marie for immoral behavior.

¶29. In summary, Marie has not shown an abuse of discretion in the chancellor's decision to modify custody.

### 5. Denial of Marie's Post-Judgment Motions

¶30. After announcing his decision from the bench, the chancellor asked Dallas's attorney to prepare a written judgment, which the chancellor ultimately executed and entered with minor changes; the decision from the bench was incorporated by reference. Marie moved, unsuccessfully, to have the written judgment amended to more strictly comport with the chancellor's findings and decision as he had announced them from the bench. She also filed a motion seeking additional findings of fact and conclusions on fifty-five enumerated points, several of which contained numerous sub-requests. The motion was denied, and Marie filed a Rule 59 motion to alter or amend the judgment, which was also denied. On appeal, Marie contends that the chancellor erred in denying these motions.

¶31. It is a well-established rule in equity that "every decree is in the breast of the court until entered, and a decree has no validity until written out and signed by the chancellor." *Banks v. Banks*, 511 So. 2d 933, 934 (Miss. 1987) (quoting *Orr v. Myers*, 223 Miss. 856, 862, 79 So. 2d 277, 278 (1955)). *Banks* is directly on point in this respect; the Mississippi Supreme Court held that a chancellor could modify his oral pronouncements at will prior to the entry of a written final judgment. *See id.* at 934-35. Thus, where the written judgment varies from the court's oral pronouncements, the written judgment controls and is presumptively the chancellor's true decision. This is true even if it was prepared by one of

13

the parties rather than the chancellor himself. *See Bluewater Logistics LLC v. Williford*, 55 So. 3d 148, 155-57 (¶¶24-33) (Miss. 2011).

¶32. Marie also complains that the chancellor erred in not hearing her out as to these complaints; the chancellor summarily denied her "Motion for Proposed Judgments." Marie provides no authority requiring the chancellor to hold a hearing on the motion, and we are aware of none; so we cannot find any error here.

¶33. As to Marie's numerous requests for clarification or additional findings of fact, on appeal she only addresses two specific alleged deficiencies. First, she contends that the chancellor failed to specifically identify the material change in circumstances that warranted the change in custody. There is some merit to this contention, as the chancellor appears to have discussed both the material changes and their impacts on the children simultaneously, with the express findings being harmful impacts rather than material changes. But the chancellor's meaning is clear when the opinion is read as a whole, and the chancellor identified changed circumstances he found, in the aggregate, to be material and adversely affecting the children—Marie's household was unstable, she was using illegal drugs, and she was not properly caring for the children.

¶34. Marie's other complaint is that the chancellor failed to "completely make distinct findings related to the *Albright* factors"; Marie contends the chancellor was required to address each of the *Albright* factors. But she does not explain which factors the chancellor failed to consider or how that alleged failure would have affected the outcome of the case.

14

The only applicable factors we can see that the chancellor did not expressly address are continuity of care and the health and age of the parents. The former, though it favored Marie, was discussed at great length in the chancellor's analysis of whether there had been a material change of circumstances—the chancellor concluded that living in Marie's home had been detrimental to the children. As to the age and health of the parents, Dallas and Marie appear to have been similarly situated such that the factor favored neither parent, with the possible exception of Marie's drug use—something the chancellor considered elsewhere and found to favor Dallas. "[T]he *Albright* factors exist to ensure the chancellor considers all the relevant facts before she reaches a decision" regarding the children's best interest. *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). We are satisfied the chancellor did consider all the relevant facts here, and so we will not disturb the decision.

¶35. As to the remaining requests for findings of fact, we see no abuse of discretion in the chancellor's refusal to make further findings. A chancery court "has technically complied with the mandates of Rule 52 where it makes general findings of fact and conclusions of law although requested by a party to make specific findings." *Lowery v. Lowery*, 657 So. 2d 817, 819 (Miss. 1995). The chancellor's opinion, as delivered from the bench, spans more than ten pages of the transcript, and, in our judgment, it adequately addresses the issues that were before the court. The chancellor resolved the major factual disputes explicitly and cited and employed the relevant standards for modification and custody. We can find no error here.

¶36. Finally, as to Marie's Rule 59 motion, there was only one piece of what was arguably

15

new evidence before the court. After announcing his decision from the bench, but before entering the final judgment, the chancellor ordered Marie to immediately submit to testing for illegal drug use. Both hair and urine were tested, and the results were consistently negative for methamphetamine. But Marie did test positive for the opioids hydrocodone and oxycodone, and she apparently did not have a current prescription for either. She filed a letter from a doctor saying she had a prescription the prior year for a drug that included oxycodone, but that was at least five months before the drug test. As we explained above, our review of the denial of a Rule 59 motion is extremely deferential. *See Adams v. Green*, 474 So. 2d 577, 582 (Miss. 1985). We can find no error with regard to newly discovered evidence. Otherwise, Marie's Rule 59 motion tracked the same issues she has raised on appeal, and as we find the contentions without merit here, we can find no abuse of discretion in the chancery court's denial of the motion.

### 6. Visitation

¶37. Finally, Marie contends that the chancellor erred in "altering visitation provisions . . . without evidence being presented." Essentially, she contends that the chancellor was required to award her the same visitation schedule and terms as she had agreed to give Dallas in the original divorce settlement. We are aware of no authority requiring this, and Marie provides us with none. Moreover, the visitation provisions are quite similar, and Marie was awarded more or less "standard" visitation with the children—visitation every other weekend, two two-week periods of extended summer visitation, and alternating holidays.

16

No error has been shown on this point.

¶38.	**AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**